Eric H. Gibbs (Bar No. 178658)
Andre Mura (Bar No. 298541)
Linda Lam (Bar No. 301461)
**GIRARD GIBBS LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
lpl@classlawgroup.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK QUEENAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>VIZIO, Inc.; VIZIO Holdings, Inc.; VIZIO Inscape Technologies, LLC; and VIZIO Inscape Services, LLC,<br><br>Defendants. | Case No. 8:17-cv-00010<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Mark Queenan ("Plaintiff") alleges the following against Defendants VIZIO, Inc.; VIZIO Holdings, Inc.; VIZIO Inscape Technologies, LLC; and VIZIO Inscape Services, LLC (collectively referred to as "VIZIO"):

## I. INTRODUCTION AND SUMMARY OF CASE

1. If you own a VIZIO Smart TV, Friday night movie night in the privacy of your home is a surprisingly public affair. This is because VIZIO Smart TVs watch what you're watching while you're watching it.

2. VIZIO collects highly specific data about consumers' viewing histories and preferences through invasive software secretly installed on millions of its Smart TVs. It then discloses this data to advertisers and media content providers so they can deliver targeted advertisements. These targeted ads are sent not just to the Smart TVs, but also to any smartphones, tablets, PCs, or other devices within the home that share the same Internet connection as the Smart TV.

3. Monetizing consumer data is a critical part of VIZIO's business plan. The television market is saturated and highly competitive. VIZIO's growth strategy hinges not only on sales of its Smart TVs, but also on its ability to profit from the collection and disclosure of a rich portfolio of consumer data, including personal viewing histories and preferences, among other information.

4. In essence, VIZIO's business plan treats consumers as VIZIO's very own Nielsen family. The critical difference is that, unlike VIZIO consumers, Nielsen family members agree to share their viewing habits and are paid for their participation.

5. VIZIO single-handedly and deceptively created "a community of over 8 million VIZIO connected units, or VCUs," referring to Internet-connected Smart TVs that transmit data that is collected by VIZIO's Inscape software.[1]

---

[1] VIZIO Form S-1 Registration Statement, https://www.sec.gov/Archives/edgar/data/1648158/000119312515262817/d946612ds1.htm#toc946612_2 (last visited Aug. 11, 2016).

6. This is community by conscription, not consent. The data collection software—Smart Interactivity—is turned "on" by default. Consumers of VIZIO's Smart TVs are therefore automatically included in this community. No other major television manufacturer—not Samsung, not LG Electronics— tracks users' viewing habits unless they affirmatively elect to share their sensitive information.

7. Though consumers may turn off Smart Interactivity, VIZIO obscures that option to discourage opt-outs. Even assuming consumers discovered that VIZIO was collecting their viewing data and then managed to navigate the opt-out process, the opt-out function was broken during much of the relevant time period. An independent investigation by security software company Avast, published in the fall of 2015, found that the "off" function was not operational "for months, if not years. That means consumer data has been shared without consent for this entire span of time."[2]

8. VIZIO disclosed extensive consumer data to advertisers, data brokers, media content providers, and other third parties. That information included viewing history and other information particularly useful to uniquely identify individuals. Such information includes, but is not limited to, the online services a consumer visited and the presence of a consumer's other Internet-connected devices. VIZIO also disclosed consumers' Internet Protocol (IP) addresses, media access control (MAC) addresses, and zip codes. This personally identifiable information can be used to pinpoint a consumer's physical location (*i.e.*, "geolocation" information).

9. VIZIO knows advertisers and data brokers can and do connect these dots. And yet VIZIO falsely and deceptively tells consumers that the information it discloses along with viewing habits cannot be traced back to them. For instance, it characterizes the information it discloses as "non-personal" or "anonymous" information even though it uniquely identifies individuals and their viewing habits.

[2] Aaron McSorley, *The Anatomy of an IoT Hack*, https://blog.avast.com/2015/11/11/the-anatomy-of-an-iot-hack/#more-38414 (last visited Aug. 11, 2016).

10. Because a large number of opt-outs would threaten VIZIO's ability to profit from its Inscape data services business, VIZIO purposefully omits information about Inscape data collection practices or Smart Interactivity in advertising, marketing, or television packaging. VIZIO's Smart TV packaging, for example, touts its "connectivity," by which it means the ability of the television to deliver programing available through the Internet and also from cable and satellite providers, streaming devices, and other connected media sources. Nowhere on its packaging, however, does VIZIO tell consumers that it discloses to advertisers and data brokers their viewing histories and information used to link them to their viewing histories. Neither does VIZIO disclose this in advertising and marketing.

11. Any reference to Inscape data services or Smart Interactivity which may (or may not) be found in obscure sections of its website, in some (but not all) iterations of its privacy policies, or pop-ups which appear on the television screen and then quickly disappear, is not an adequate disclosure. Such disclosures are hard to find, tough to understand, fleeting, or buried alongside other ads or messages to minimize their significance and implications.

12. Plaintiff is a consumer of a VIZIO Smart TV who did not consent to this invasive data collection program. He brings this putative class action suit against VIZIO to enforce his and other VIZIO owners' privacy and consumer rights under federal and state law.

13. The privacy violations occur because VIZIO has collected and disclosed Plaintiff's sensitive viewing histories and personal information without his consent. The movies or television consumers watch may reveal sensitive information suggestive of their politics, religious views, or sexuality—in other words, his most personal and intimate details. As Congress itself has recognized, "films are the intellectual vitamins that fuel the growth of individual thought."[3] The "intimate process" of "intellectual

---

[3] Committee Report, S. Rep. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).

growth is one of privacy" which "should be protected from the disruptive intrusion of a roving eye."[4] VIZIO has violated the federal and state privacy rights of its consumers by, intercepting, collecting, and disclosing their sensitive viewing histories, and information capable of linking them to their viewing histories, without their consent.

14. In addition, VIZIO's affirmative misrepresentations and material omissions regarding its data collection program and invasive tracking software are false, deceptive, and misleading in violation of state consumer protection laws. Had Plaintiff known the truth about VIZIO's data collection practices and tracking software, he would not have purchased a VIZIO Smart TV or would have paid less for it.

15. These harms are independently actionable and justify the relief sought here, including statutory damages, actual damages, and restitution. In addition, because VIZIO continues to collect sensitive consumer data without consent and has not changed its practice of automatically including consumers in the Inscape data collection program, equitable relief, including an injunction, is appropriate here.

## II. PARTIES

### A. Plaintiff

16. Plaintiff Mark Queenan is a resident of Plantation, Florida. Mr. Queenan purchased a VIZIO Smart TV, Model No. M55-C2, in Miami, Florida. Mr. Queenan connected his VIZIO Smart TV to the Internet via a Wi-Fi connection shortly after purchasing it, and used the Netflix and YouTube "apps," among others, on the television to stream video content. Mr. Queenan also connects his Smart TV to a DVD player and cable box. When Mr. Queenan purchased his Smart TV, he was not aware that VIZIO would collect his viewing data and disseminate that information to third parties. After he learned of this on a local radio news program, he proceeded to learn how to deactivate the data collection.

17. When shopping for his Smart TV, Plaintiff looked at the description of the television provided on the boxes in which his VIZIO Smart TV was packaged. The

---

[4] *Id.*

packaging for the VIZIO Smart TV described its features and indicated that the television was equipped to deliver video content through the Internet and could display content from cable and satellite providers, streaming devices, and other connected media sources. The packaging, however, failed to inform Plaintiff that if he took advantage of those features or watched live broadcast programming on his Smart TV, his viewing data would be collected by VIZIO and disseminated to third parties. Had Plaintiff known the truth about VIZIO's collection and dissemination of Plaintiff's viewing data, Plaintiff would not have purchased, or would have paid less for, his VIZIO Smart TV.

18. At no time did Plaintiff consent to having his viewing information collected and disseminated to third parties.

**B. Defendants**

19. Defendant VIZIO, Inc. is a California corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO, Inc. is registered to conduct business in California. VIZIO, Inc. designs, markets, and distributes for sale consumer electronic devices, including Smart TVs, throughout the United States, including in this District.

20. Defendant VIZIO Holdings, Inc. is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California.

21. Defendant VIZIO Inscape Technologies, LLC, formerly known as Cognitive Media Networks, Inc., is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO Inscape Technologies, LLC conducts business throughout the United States, including in this District.

22. Defendant VIZIO Inscape Services, LLC is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO Inscape Services, LLC is registered to conduct business in California.

23. Defendants acted as one, jointly, collectively, or in concert unless a particular Defendant is identified by its full name.

## III. JURISDICTION AND VENUE

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this action arises under a federal statute. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

25. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) at least one Plaintiff is a citizen of a different state than the Defendants; (ii) the amount in controversy exceeds $5,000,000; and (iii) there are at least 100 individuals in the putative class that Plaintiff seeks to represent through this action.

26. This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in California, are present and licensed to conduct business in California, and because the events giving rise to this lawsuit occurred, in substantial part, in California.

27. Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because Defendant VIZIO is headquartered in this District, Defendants conduct substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### Smart TVs

28. Since the mid-2000s, Smart TVs have become increasingly popular in the United States. A Smart TV is essentially a technological cross between a computer and a television. Aside from the traditional function of a television set, a Smart TV is also equipped with integrated software applications that allow users to access the Internet, and on-demand services such as Netflix, Hulu, and Pandora, and other online media content, such as Facebook and Twitter.

29. Although Smart TVs are more expensive than traditional television sets, Smart TVs are popular because they are equipped to deliver movies and television shows

on an on-demand basis, including programming that may not be conventionally available (*e.g.*, broadcast on network or cable television).

**VIZIO's Business Platform**

30. VIZIO is a consumer electronics company headquartered in Irvine, California. Since its founding in 2002, it has sold over 65 million television and audio sets. VIZIO sells its products in over 8,000 retail stores throughout the United States, including large chains such as Costco, Sam's Club, Walmart, and Best Buy. In 2014, it held the second-largest market share of Smart TVs in the country.

31. VIZIO has developed a business platform that rests on three pillars.

32. The first is its line of connected entertainment products, which include Smart TVs and audio products.

33. The second is its discovery and engagement software, called either VIZIO Internet Apps (and Apps Plus) or SmartCast, which delivers video and audio content.

34. The third is Inscape data services, which uses automatic content recognition technology to capture, in real time, up to 100 billion viewing data points each day from over 8 million VIZIO Smart TVs. VIZIO calls its automatic content recognition technology "Smart Interactivity."




35. According to VIZIO, there is a market opportunity for audience and advertisement measurement. In 2014, the total global market spent on the industry was

approximately $1.9 billion. Competitors in the market for viewing behavior data and analysis include well-established companies such as A.C. Nielsen and Rentrak.




36. VIZIO believes the principal competitive factors impacting the market for its Inscape data services are the quality and accuracy of its data, the timeliness of its data, and the amount and level of detailed information and insight its data provides. "Advertisers and media content providers are looking for access to accurate, real-time data regarding consumer preferences and behaviors so they can better measure and increase their return on content creation and advertising spend."[5] VIZIO has partnered with media and analytics companies to provide them with user data.

37. To monetize its data collection platform, VIZIO has developed partnerships with advertisers, media content and analytics providers, and brands. VIZIO's business growth is, by its own account, highly dependent on the success of its Inscape data services. VIZIO has sought to distinguish itself from market competitors such as Nielsen by designing its Inscape data services to provide data of such quantity and quality to be

[5] VIZIO Form S-1 Registration Statement at 90, https://www.sec.gov/Archives/edgar/data/1648158/000119312515262817/d946612ds1.htm#toc946612_2 (last visited Aug. 11, 2016).

highly valuable to advertisers. According to VIZIO, its current user base of 8 million Smart TVs reflects U.S. census demographics and provides more accurate viewing behavior data in real time than any other brand.

**VIZIO'S Collection and Dissemination of Viewing Histories and Personally Identifiable Information Is Critical to Its Business Model**

38. For the years 2013, 2014, and through the third quarter of 2015, VIZIO's reported net income was $25.7 million, $45.0 million, and $44.3 million, respectively.[6] VIZIO generates billions of dollars in annual revenues, demonstrating that it has slim margins. VIZIO attributes a substantial portion of its net income to sales of its Smart TVs. To make up for these slim margins, VIZIO sought to develop a new source of revenue by monetizing the viewing habits of its millions of customers and settling that information to advertisers without adequately disclosure to its customers.

39. VIZIO has recognized the threat to its business model that exists if consumers were to understand its tracking software. In an October 2015 filing with the Securities and Exchange Commission regarding its initial public offering, VIZIO revealed its concern that its customers might react negatively to the surreptitious collection of their data: "Our customers may also object to or opt out of the collection and use of their data, which may harm our business."

**VIZIO's Data Collection Software and Program**

40. *Discovery and engagement software.* VIZIO delivers video content through VIZIO Internet Apps, Internet Apps Plus, and SmartCast. This software allows consumers to access programming available on Netflix, Hulu, YouTube, and Amazon Instant Video, among others. VIZIO Internet Apps, Internet Apps Plus, and SmartCast are software that are pre-installed on the television or installed through software updates. In turn, Netflix, Hulu, YouTube and Amazon Instant Video and the like are entertainment companies that create, produce, or license video programming either for free, for rent, or as part of a paid subscription.

41. The VIZIO Internet Apps and Internet Apps Plus user interface displays a streamlined App Launcher that allows users to select available programming. The app may also be accessed through the VIZIO Smart TV remote.




42. Certain VIZIO Smart TVs use "SmartCast" to deliver movies, TV shows, live streams and more across multiple apps at once. SmartCast is VIZIO's latest delivery engagement software. It can be used on a tablet remote that comes with the television. This technology allows a user to watch programming on the tablet remote, or to "cast," or display, content from the tablet remote to the television display or speakers.

43. This software is also available for use on a smartphone through the VIZIO SmartCast App, which is available for download for free from the Apple App Store or Google Play. This technology also "casts" content from a smartphone to the Smart TV.







44. *Inscape data services.* Inscape captures real-time viewing behavior data from VIZIO Smart TVs—up to 100 billion viewing data points each day—thereby enabling VIZIO to provide this data to advertisers and media content providers, who in turn delivered and re-targeted advertisements. Ad re-targeting is the process of pushing ads to consumers based on their previous interactions with that ad, in situations where the consumers' first view of the ad did not result in a sale or conversion.

45. This data program is powered by automatic content recognition (ACR) technology, which is designed to recognize attributes of the content displayed on VIZIO Smart TVs and match those attributes to a database of existing content, such as movies, TV shows, and games.

46. VIZIO calls its ACR technology "Smart Interactivity." Smart Interactivity software was designed by Cognitive Media Networks, Inc. VIZIO acquired Cognitive Media in August 2015.

47. Using Smart Interactivity software, the Inscape program is able to collect, aggregate, and store data regarding most content displayed on VIZIO Smart TVs, including content from cable and satellite providers, streaming devices, and gaming consoles. In fact, Inscape collects viewing data behavior from all media sources that connect via external input to the Smart TVs—for example, set top boxes, digital video recorders, streaming media players, Blu-ray and DVD players and gaming consoles.




48. Based upon the findings of an investigation conducted by journalists at ProPublica, VIZIO's technology is said to be "watching you." VIZIO's data collection includes, but is not limited to, data related to publicly available content displayed on VIZIO Smart TVs, such as the identity of a broadcast, cable, or satellite television provider, and the television programs and commercials viewed (including time, date, channel, and whether they were viewed live or at a later time).

49. Inscape also collects consumers' IP addresses (which are unique identifiers assigned to personal digital devices such as laptops, tablets, and Smart TVs), zip codes,

and online services visited by the consumer, as well as MAC addresses, product model numbers, hardware and software versions, chipset IDs, and region and language settings, among other information. In turn, this information can be used to learn even more about the user, including demographic details such as age, profession, and wealth indicators.

50. For SmartCast users, Inscape collects the above and also: (1) information about what video or audio is playing on the Smart TV, tablet remote, or mobile phone using the SmartCast App; and (2) programming choices requested, the date and time of these choices, user-initiated searches, content consumers browse while using the SmartCast tablet, or other commands communicated to the SmartCast Products through the SmartCast App.

51. SmartCast app users may create a myVIZIO account or log into an existing myVIZIO/Fandemonium account.

52. For SmartCast users, VIZIO associates the data collected with any myVIZIO account profile, which includes a first and last name and e-mail address.

53. VIZIO then discloses the associated data described above to advertisers and data brokers, and other third parties, including its partners.

**Smart Interactivity**

54. VIZIO initiated the Smart Interactivity feature in or about February 2014 through an "over-the-air" update. It also began pre-installing Smart Interactivity software on its Smart TVs in or around that same time.

55. Unlike its competitors, VIZIO's default policy is to turn on this data collection feature on all of its Smart TVs.

56. This default 'on' setting differentiates VIZIO from competing television manufacturers such as Samsung and LG Electronics, who only track users' viewing habits if users voluntarily turn the feature on. Unless a Samsung or LG consumer opts into the data collection program, those companies will not collect the consumer's personal viewing histories. VIZIO consumers, by contrast, must opt out of the data collection feature to avoid having their personal viewing habits collected.

57. In its Prospectus, VIZIO brags about the scope and detail of the data collected and sold and its potential advertising profits as follows:

> Our Inscape data services capture, in real time, up to 100 billion anonymized viewing data points each day from our over 10 million VCUs [(VIZIO connected units)]. Inscape collects, aggregates and stores data regarding most content displayed on VCU television screens, including content from cable and satellite providers, streaming devices and gaming consoles. Inscape provides ***highly specific viewing behavior*** data on a massive scale with great accuracy, which can be used to generate intelligent insights for advertisers and media content providers and to drive their delivery of more relevant, personalized content through our VCUs.

58. VIZIO refers to the information it surreptitiously collects as "Non-Personal Information," which VIZIO describes as "data in a form that does not, on its own, permit direct association with any specific individual." As alleged, this includes, but is not limited to, the IP addresses products that are assigned to users' internet-connected devices, their zip codes, the online services they visit, information about their VIZIO products (such as MAC addresses, product model numbers, hardware and software versions, chipset IDs, and region and language settings), as well as information about the products users request or purchase, the presence of other devices connected to their local networks, and the number of users and frequency of use of VIZIO products and services. VIZIO also collects "anonymous information regarding customer activities on our websites, on Internet-connected products and services, and on VIZIO's Internet store.

59. Although VIZIO claims that the information collected is non-personal, technical experts have challenged this characterization. For example, Extreme Tech's website contains the following excerpt from an article authored by Joel Hruska on November 10, 2015.

> "Non-personally identifiable information" is a contradiction in terms, particularly when the companies in question have access to mobile data. The entire point of VIZIO's advertising push is

> to sell this information to companies so they can track you on multiple devices. In order to do that, they're going to need to find those devices. If an advertiser can pick up on the fact that you watch, say, Arrow in order to send you ads enticing you to watch The Flash, then that advertiser effectively knows who you are.[6]

60. If a consumer wanted to opt out, that option was not functional for a considerable period of time during the relevant time period. According to an independent investigation by security software company Avast, published in the fall of 2015, the "off" function was not operational "for months, if not years. That means consumer data has been shared without consent for this entire span of time."[7]

61. If a VIZIO Smart TV is ever reset to factory settings, either intentionally or inadvertently through an update or power failure, the TV will return to its default settings, thereby reactivating the Smart Interactivity feature.

62. Although intending to profit from selling personal information to third parties without consent, VIZIO itself recognized potential privacy law concerns. VIZIO stated the following:

> We collect, process, store, use and to some extent disclose information collected from or about purchasers and users of our products, and from the devices themselves. **The collection and use of personal information**, and analysis and sharing of anonymous user data and unique identifiers to inform advertising or analyze viewing behaviors subject us to legislative and regulatory burdens, may expose us to liability, and our actual or perceived failure to adequately protect consumer data could harm our brand, our reputation in the marketplace and our business.
>
> Privacy laws and regulations, if drafted or interpreted broadly, could be deemed to apply to the technologies we use to collect, analyze and share viewing behaviors or other data collected from our Smart TVs or

---

[6] Joel Hruska, "Vizio TVs Caught Tracking Viewing Habits, Selling Data to Advertisers." ExtremeTech (Nov. 10, 2015) (available at http://www.extremetech.com/internet/217762 viziotvs-caught-tracking-viewing-habits-selling-data-to-advertisers) (emphasis in original)

[7] Joel Hruska, *New Vizio hack reveals company shares your data whether you accept its privacy policy or not*, http://www.extremetech.com/extreme/217923-new-vizio-hack-reveals-company-shares-your-data-whether-you-accept-its-privacy-policy-or-not (last visited Aug. 11, 2016).

> consumers, and could restrict our information collection methods or decrease the amount and utility of the information that we would be permitted to collect and share. . . . In addition, a determination by a court or government agency that any of our practices, or those of our agents, do not meet these standards could result in liability, or result in negative publicity, and adversely affect our business

**VIZIO Knows the Information It Discloses Identifies Individual Viewers and Their Viewing Habits**

63. As discussed, the consumer data VIZIO discloses to advertisers, data brokers, media content providers, and other third parties, such as its partners, includes viewing history and information which identifies individuals. This information reveals sensitive geolocation information and is personally identifying.

64. Media access control (MAC) addresses, for example, are unique 12-digit identifiers that are assigned to individual mobile devices, computers, Smart TVs, or other electronic devices. These addresses are tied to the devices' physical embedded chipsets and thus are persistent throughout the life of the device. MAC addresses are automatically broadcast when devices search for networks or communicate with other devices.

65. MAC addresses often can be linked to individuals by name. For example, when you sign into a commercial WiFi hotspot, your MAC address is tied to the information you use to sign up for the service. Additionally, automatic WiFi probes also broadcast the names of the last networks a device has connected to, which can reveal additional information about the individual, such as the name of a home or work network.

66. MAC addresses can be used to develop highly specific geolocation data. For example, retail analytics firms have used MAC addresses to pinpoint customer locations—a practice which the Federal Trade Commission has investigated.

67. When VIZIO discloses MAC addresses of all the devices that connect to the same network as a VIZIO Smart TV, along with IP addresses, zip codes, the online services consumers visit, the presence of other devices connected to the consumer's local network, the number of users and frequency of use of VIZIO products and services, and

other information, the disclosure provides a "game plan" to associate individuals with their viewing habits. And for SmartCast consumers, the association of myVizio account information, which includes first and last name and e-mail addresses along with viewing data and other personal information, makes it especially easy for third parties to associate viewing habits with actual persons.

68. Though VIZIO falsely and misleading informs consumers that it provides only non-personal or anonymized information, and that viewing data cannot be linked to actual individuals, VIZIO knows that individuals and their viewing histories can be, and are easily being, identified and linked by the information VIZIO discloses.

69. In fact, individuals can be identified with far less information than what VIZIO discloses. A groundbreaking study published in 2000 revealed that three pieces of information—zip code, birth date (including year), and sex—uniquely identified 87 percent of the U.S. population.[8] Other studies have found similarly high rates of identification.[9]

70. At least since 2006, video service providers and data aggregators have known that the disclosure of viewing data not associated with individual names can nevertheless be associated with specific individuals. That year, Netflix released a data set representing the movies rated by over 480,000 Netflix customers and the date each rating was given. In an apparent effort by Netflix to anonymize the data, the company replaced customers' names with unique numbers and did not include addresses, phone numbers, or other direct identifiers.[10]

---

[8] Latanya Sweeney, *Uniqueness of Simple Demographics in the U.S. Population*, Carnegie Mellon University, School of Computer Science, Data Privacy Laboratory, Technical Report LIDAP-WP4 (2000).

[9] Philippe Golle, *Revisiting the Uniqueness of Simple Demographics in the US Population*, ACM Workshop on Privacy in the Elec. Society at 77, 78 (2006).

[10] March 12, 2010 Letter from Maneesha Mithal to Reed Freeman, https://www.ftc.gov/sites/default/files/ documents/closing_letters/netflix-inc./100312netflixletter.pdf (last visited Aug. 11, 2016).

71. Netflix released the data "as part of its Netflix Prize 1 contest ("Prize 1"), through which researchers competed to improve the algorithm Netflix uses to recommend movies to its subscribers. Netflix's algorithm takes into account past viewing habits and movie preferences of each of its subscribers."[11]

72. Following the release of this data set, two researchers at the University of Texas announced that it was possible to identify a significant number of subscribers based on the data set released.[12] Using publicly-available movie reviews posted by Netflix subscribers on the popular site IMDb (www.imdb.com), "one could determine all of the Netflix movies that a subscriber had rated for a given period of time."[13] By way of example, the researchers were able to identify one user's movie choices, which may suggest facts about his or her politics ("Fahrenheit 9/11"), religious views ("Jesus of Nazareth"), or sexual preference ("Queer as Folk").

73. Netflix nevertheless announced a second Prize contest in 2009. This time it planned to release an even more comprehensive data set of viewing habits and demographic information. In response, a group of Netflix customers filed a class action lawsuit, and the FTC warned Netflix that the second Prize contest raised privacy concerns as well as questions regarding whether its representations to consumers about its privacy policies were false or misleading under federal law. Netflix ultimately settled the private suit and agreed not to proceed with the contest as planned.

74. VIZIO thus knows that third parties to whom it discloses this information, which includes its partners, can and do connect these dots. The linkage between viewing data and individuals is firm and readily foreseeable to VIZIO, in particular because the

[11] *Id.*
[12] Arvind Narayanan & Vitaly Shmatikov, *Robust De-anonymization of Large Sparse Datasets*, Proceedings of the 2008 IEEE Symposium on Security and Privacy at 111-123 (hereinafter "Netflix Prize Study"), https://www.cs.utexas.edu/~shmat/shmat_oak08netflix.pdf (last visited Aug. 11, 2016).
[13] Mithal Letter, *supra* note 8.

information it discloses is effectively a correlated look-up table, complete with geolocation data.

75. As discussed, VIZIO has acknowledged to investors, but not consumers, that its activities may violate various privacy laws and regulations: "[W]e cannot assure you that our privacy policies and other statements regarding our practices will be sufficient to protect us from liability or adverse publicity relating to the privacy and security of information about consumers or their devices." Further, VIZIO has informed investors that it may be the subject of litigation over these practices.

**VIZIO's Product Packaging, Advertising, Marketing, Website, and Privacy Policy Are False or Misleading and Omit Material Information**

76. In advertising and marketing, and on product packaging, VIZIO promotes the connectivity of its Smart TVs in two critical ways. First, it tells consumers that its Smart TVs have built-in WiFi and are Internet-enabled, and that its VIZIO Internet Apps (and Apps Plus), and SmartCast are a "passport to a world of entertainment, movies, TV shows and more." Next, it tells consumers its Smart TVs are "perfect for connecting all your high definition entertainment devices to the TV." This feature is often promoted through pictures of HDMI and USB ports.

77. But VIZIO does not disclose that if consumers take advantage of those features and/or watch live broadcast programming on their Smart TVs, their viewing data will be collected by VIZIO and disseminated to third parties.

78. Consider VIZIO's representations in product packaging.




79. While the packaging on VIZIO's Smart TVs describe its features and indicate that the televisions are equipped to deliver video content through the Internet and can display content from cable and satellite providers, streaming devices, and other connected media sources, the packaging fails to inform (let alone adequately inform) consumers that if they take advantage of the TV's connectivity platform, their viewing data and personal information will be collected and shared with others.

80. Neither is Smart Interactivity and Inscape data services disclosed, let alone adequately disclosed, during the set up process for VIZIO Smart TVs. On the televisions themselves, any reference to Smart Interactivity is deeply embedded in an obscure settings menu. This reference is displayed in small font that is limited to a fraction of the screen size. This reference does not explain what Smart Interactivity is. A consumer would have no reason to know to turn it off.

81. Also, on the televisions, Smart Interactivity and Inscape are not adequately disclosed in any Privacy Policy which may be viewed on the screen. The Privacy Policy is buried within the "Reset & Admin" section of a Smart TV's settings menu, and is presented in extremely small font size.




82. Smart Interactivity and Inscape are not adequately disclosed in marketing or advertising on VIZIO's website, either. VIZIO's website touts its Smart TVs connectivity but does not disclose that VIZIO will collect and disseminate viewing habits and personal information upon connection. In fact, Smart Interactivity and Inscape data services are conspicuously absent from VIZIO's online advertising for its entire M-Series and P-Series line.

83. To find any mention of Smart Interactivity on VIZIO's website, a consumer would have to know to look for that term. What a consumer would find is VIZIO's statement that "Smart Interactivity intelligently recognizes the content on the screen in

order to determine which interactive features to display on your device. This allows viewers to enjoy additional, related content for a richer, more interactive TV experience." This statement is misleading and confusing in that it suggests that the collection and dissemination of viewing histories is for the benefit of the user, rather than a source of revenue for VIZIO, and does not disclose what Smart Interactivity actually does.

84. VIZIO's privacy policies have been updated over time and are available on its website. In all iterations in which VIZIO discusses its data collection practices, its statements are false or misleading and omit material information.

85. Critically, VIZIO falsely and deceptively tells consumers in its privacy policy that the information it discloses along with viewing habits cannot be traced back to consumers. It characterizes the information it discloses as "non-personal" or "anonymous" even though the information is useful for uniquely identifying individuals and their viewing habits.

86. Relatedly, VIZIO also fails to adequately inform consumers about its data collection program, including that viewing data and personally identifiable information is being disclosed to third parties. The information disclosed is valuable and useful precisely because it is not anonymous but instead is personally identifying. VIZIO does not properly disclose that it sells this information to third party advertisers and data brokers.

87. VIZIO gives consumers a false sense of security when it informs them it 'hashes' (i.e., transforms a string of characters into a shorter, fixed-length value that represents the original string) and replaces parts of IP addresses before sharing them with media and analytics partners. The FTC has criticized hashing as ineffective because it is so easy to circumvent. Free precomputed tables of known hashes (*i.e.*, rainbow tables) are available that make reversing known hashes practically instantaneous." Also, hashing generates a unique number that can be used to identify a device throughout its lifetime and is a process that can easily be reversed. Though VIZIO tells consumers in certain privacy policies that it takes measures to ensure that the data it discloses is securely

transmitted, in or around 2015, Avast security discovered that the information transmitted to Cognitive Networks was being transferred insecurely because of a “known exploit” in the software. According to VIZIO, that exploit was closed when the software was updated in 2015.

88. Even today, Smart Interactivity and Inscape data services are also conspicuously absent from VIZIO’s online advertising for entire product lines. VIZIO’s website touts its Smart TVs connectivity but does not disclose that VIZIO will collect and disseminate viewing habits and personal information upon connection.

89. Any reference to Inscape data services or Smart Interactivity which may (or may not) be found in obscure sections of its website, in some (but not all) iterations of its privacy policies, or pop-ups which appear on the television screen and then quickly disappear, are not adequate disclosures because they are hard to find, tough to understand, fleeting, or buried alongside other ads or messages in order to distract from the disclosures.

## V. CLASS ACTION ALLEGATIONS

90. Pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and all Members of the Nationwide Class (the “Nationwide Class”), which shall initially be defined as:

> All individuals in the United States who purchased a VIZIO Smart TV with Smart Interactivity capability for personal or household use, and not for resale, during the applicable statute of limitations period.

91. Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and all Members of the Florida Class (the “Florida Class”), which shall initially be defined as:

> All persons who purchased a VIZIO Smart TV with Smart Interactivity capability in Florida for personal or household use, and not for resale, during the applicable statute of limitations period.

92. Excluded from the Classes are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants; officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter, and the members of their immediate families and judicial staff.

93. The Classes described in this Complaint may be jointly referred to as the "Class" and proposed Members of the Classes may be jointly referred to as "Class Members."

94. Plaintiff reserves the right to amend or modify the Class and/or Subclass definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant.

95. The Court can define the Class and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class Members if, based on discovery of additional facts, the need arises.

96. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Class as a whole. Specifically, Defendants continue to obtain and disseminate sensitive viewing histories and personal information on an opt-in basis and without consent, and to date have not adequately disclosed the true nature of the VIZIO Smart TVs with integrated Smart Interactivity technology, including that the TVs collect and disseminate consumers' personal information.

97. Numerosity and Ascertainability: The exact number of members of the Class is unknown as such information is unavailable to Plaintiff at this time. However, Plaintiff believes individual joinder in this case is impracticable. The Class likely consists of hundreds of thousands of individuals. These individuals can be readily ascertainable through Defendants or their agents' records and are obtainable to Plaintiff only through the discovery process.

98. Predominance of Common Questions of Fact and Law: Questions of law and fact common to all Class members exist and predominate over any questions affecting only individual Class members, including, but not limited to, the following:

a. Whether Defendants unlawfully collected and disseminated Plaintiff's and Class members' personal information;

b. Whether Defendants disclosed to Plaintiff and Class members before the tracking software was activated on their VIZIO Smart TVs that their personal information would be collected and disseminated to third parties;

c. Whether Defendants misrepresented or omitted material facts with regard to the Smart Interactivity feature of the Smart TVs;

d. Whether Plaintiff and Class members consented to the collection of their personal information and its sale to third parties;

e. Whether Plaintiff and Class members have a reasonable expectation of privacy in the information collected and disseminated by Defendants;

f. Whether Defendants' conduct constitutes violations of the laws and statutes asserted herein;

g. Whether Defendants' conduct was knowing;

h. Whether, as a result of Defendants' conduct, Plaintiff and Class members are entitled to damages, including compensatory, statutory, or punitive, and the amount of such damages;

i. Whether, as a result of Defendants' conduct, Plaintiff and Class members are entitled to equitable relief, such as declaratory or injunctive relief;

j. Whether Defendants were unjustly enriched by their conduct;

k. Whether, for the Nationwide Class noted above, the Video Privacy Protection Act applies to all members of the Nationwide Class; and

l. Whether, as a result of Defendants' conduct, Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, or costs of suit.

99. Typicality: Plaintiff's claims, and Defendants' defenses, are typical of the claims and defenses of and to the Class. Every member of the Class was similarly affected by Defendants' course of conduct and experienced the same harm, damages and loss based on Defendants' unlawful conduct. As such, Plaintiff and Class members must establish the same facts in order to prove the claims asserted herein.

100. Adequacy of Representation: Plaintiff does not have any conflicts with any other members of the Class, and will fairly and adequately represent and protect the interests of the members of the Class and any other subclass. Plaintiff has retained counsel competent and experienced in consumer protection and class action litigation, trials, and appeals.

101. Superiority of a Class Action: A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of the individual litigation would make it impracticable or impossible for the Class members to prosecute their claims individually. Absent a class action, Defendants likely will retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for these wrongs. Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains. The trial and litigation of Plaintiff's and Class members' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform court judgment. Thus, the benefits of proceeding as a class action outweigh the difficulties.

## VI. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (On Behalf of Plaintiff and the Nationwide Class Against All Defendants)

102. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

103. VIZIO is a video tape service provider subject to 18 U.S.C. § 2710(a)(4) of the Video Privacy Protection Act ("VPPA"). VIZIO is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" by delivering videos to consumers through its Internet-connected Smart TVs. VIZIO facilitates the transmission of specific video titles to be made to consumers through its VIA and VIA Plus services that allow consumers to watch movies and TV shows, listen to music, and access applications on demand.

104. As users of VIZIO's Smart TVs, Plaintiff and members of the Class are consumers within the definition of 18 U.S.C. § 2710(a)(1) of the VPPA.

105. The collection of consumers' viewing information – including movies, shows, and programs viewed, IP addresses, media access control (MAC) addresses, zip codes, computer names, and product serial numbers – constitutes the collection of personally identifiable information ("PII") within 18 U.S.C. § 2710(a)(3), because it "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

106. VIZIO has disclosed, and continues to disclose, PII to third-parties, including data brokers and advertisers, to generate revenue and profit.

107. VIZIO failed to solicit and/or obtain consent from Plaintiff and the Class members to collect and disclose their PII, nor did VIZIO provide clear and conspicuous notice of the disclosure of PII, as defined in 18 U.S.C. § 2710 (b)(2)(B).

108. VIZIO's disclosures were not made in the ordinary course of business as defined by 18 U.S.C. § 2710(a)(2), which limits disclosures to "debt collection activities, order fulfillment, request processing, and the transfer of ownership."

109. The knowing disclosure and transmission of PII violates the VPPA within the meaning of 18 U.S.C § 2710(b)(1).

110. Accordingly, Plaintiff and members of the Class are entitled under 18 U.S.C. § 2710(c)(2) to an award of damages (actual, liquidated, or punitive), reasonable attorneys' fees, other litigation costs reasonably incurred, and such other preliminary and equitable relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF

### Violation of the Wiretap Act, 18 U.S.C. § 2510 *et seq.*
### (On Behalf of Plaintiff and the Nationwide Class Against All Defendants)

111. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

112. The Federal Wiretap Act, 18 U.S.C. § 2510 et seq., prohibits the interception of any wire, oral, or electronic communications. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

113. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce…" 18 U.S.C. § 2510(12).

114. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

115. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

116. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

117. Plaintiff and Class members are persons as defined under § 2510(6) of the Act.

118. VIZIO's automated content recognition software, Smart Interactivity, is a device for purposes of the Wiretap Act because it is software used to intercept electronic communication.

119. VIZIO, through its design, authorship, programming, knowing and intentional installation, activation, and/or other involvement with Smart Interactivity software and its Inscape data program has intentionally intercepted, endeavored to intercept, and/or procured others to intercept or endeavor to intercept, electronic communications as described herein, in violation of 18 U.S.C. § 2511(1)(a). This interception was acquired during transmission, as Smart Interactivity operated in real-time to acquire the content of Plaintiff's and the Class members' electronic communications, including their viewing habits and identifying information, as described above.

120. The contents intercepted include information concerning the substance, purport, or meaning of that communication, including, but not limited to, viewing histories and preferences, IP addresses, MAC addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings.

121. Plaintiff's and the Class members' electronic communications were intercepted without their consent and for the unlawful and/or wrongful purpose of monetizing their private information, including by using their private information to create targeted advertisements for profit, without Class members' consent, and for tortious purposes and for the purpose of committing unfair business practices.

122. As a result, Plaintiff and Class members have suffered harm and injury, including due to the interception and transmission of private and personal, confidential, and sensitive communications, content, and data.

123. Plaintiff and the Class have been damaged by the interception or disclosure of their communications in violation of the Wiretap Act, as described herein, and are thus entitled to preliminary, equitable, or declaratory relief; statutory and punitive damages; and reasonable attorney's fees and litigations costs reasonably incurred. 18 U.S.C. § 2520(b).

## THIRD CLAIM FOR RELIEF

### Violation of Florida's Deceptive And Unfair Trade Practices Act ("FDUTPA") Fla. Stat. § 501.201, *et seq.* (On Behalf Of Plaintiff and The Florida Class)

124. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

125. Plaintiff and each member of the Class are "consumers" as defined by Fla. Stat. § 501.203(7).

126. Defendants, through their conduct alleged herein, are engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

127. The FDUTPA was enacted to protect consumers and businesses from unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

128. To this end, the FDUTPA declares as unlawful all unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

129. Defendants violated the FDUTPA because their conduct, as alleged herein, is deceptive and unfair.

130. Defendants' conduct is deceptive because it is likely to mislead a reasonable consumer.

131. The specifications of a consumer product are a material term of any transaction in that they directly affect a consumer's choice and conduct in purchasing a product.

132. Despite the importance of specifications to consumer purchase decisions, Defendants do not disclose that their Smart TVs have the tracking software installed, and that the tracking software monitors, collects and disseminates consumer data.

133. On the boxes in which the Smart TVs were packaged, Defendants informed Plaintiff that one would be able to stream and view video content from the Smart TVs, as well as connect the Smart TVs to other devices such as Blu-ray DVD players and gaming consoles. However, Defendants failed to inform Plaintiff that if he takes advantage of these features and/or watch live broadcast programming on his Smart TV, his viewing data is collected and disseminated to third parties. Had Plaintiff known the full truth about Defendants' collection and dissemination of Defendants' viewing data, Plaintiff would not have purchased or would have paid less for his Smart TVs.

134. Defendants' failure to disclose these specifications of their Smart TVs, as well as Defendants' failure to gain consumer consent to allow Defendants to monitor and collect consumer information by use of the tracking software, deceived consumers into believing they were purchasing a benign entertainment device.

135. Had Defendants disclosed to consumers that their Smart TVs employed the tracking software, and that consumer viewing habits and other information would be collected and disseminated without consent or knowledge, consumers would not have bought, or would have paid less for, Defendants' Smart TVs and would have avoided Defendants' products and data practices.

136. In fact, Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

137. Defendants' conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

138. Defendants' conduct offends established public policy because it violated 18 U.S.C. § 2710 and 18 U.S.C. § 2510 et seq., as explained above.

139. Defendants' conduct is substantially injurious, and is immoral, unethical, oppressive and unscrupulous because Defendants monitor, collect, and record consumer viewing habits and other information in order to sell it to third parties for profit, and does so without disclosing its data practices to consumers or obtaining consumer consent for the collection and sale of consumer data.

140. Had consumers known Defendants' Smart TVs employed software that monitored, collected and disseminated consumer viewing habits and other data, consumers would not have purchased, or would have paid less for, Defendants' Smart TVs.

141. Moreover, by surreptitiously monitoring, collecting, and recording consumer viewing habits and other information, and by selling, or otherwise disclosing, that information to third parties without consumer knowledge or consent, Defendants prevent consumers from avoiding its data practices and from protecting their right to privacy and their right to control the dissemination of their personal information.

142. Defendants knew or had reason to know that Plaintiff and the Class could not have reasonably known or discovered the existence of the tracking software, without disclosure by Defendants.

143. The injury to consumer privacy rights, and the causing of consumers to buy products they otherwise would have avoided, outweighs the profit motive and ultimate goal for Defendants' unauthorized and secretive monitoring, collection and dissemination of consumer data.

144. Defendants' deceptive and unfair conduct occurred during the marketing, distribution, and sale of Smart TVs, and therefore occurred in the course of Defendants' business practices.

145. Defendants' conduct directly and proximately caused Plaintiff and the Class actual monetary damages in the form of the price paid for the Smart TVs.

146. If Defendants had disclosed that their tracking software was installed and operating on the VIZIO Smart TVs, Plaintiff and Class members would not have purchased, or would have paid less for, the Smart TVs.

147. Pursuant to Fla. Stat. § 501.211, Plaintiff seeks an order (1) requiring Defendants to cease the deceptive and unfair practices described herein; (2) requiring Defendants to pay damages to Plaintiff and the Class; and (3) awarding attorney's fees and court costs.

**FOURTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(On Behalf of Plaintiff and the Florida Class Against All Defendants)**

148. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

149. Plaintiff and the Florida Class have conferred a benefit on VIZIO in the form of their personal information and viewing habits. Absent the unauthorized collection of such information and its disclosure to third parties, VIZIO would have had to pay Plaintiff and the Florida Class money in exchange for this viewing history. In addition, Plaintiff would not have purchased or would have paid less for his Smart TV, had VIZIO disclosed that its Smart TVs collect user data and viewing habits for dissemination.

150. VIZIO has obtained moneys which rightfully belong to Plaintiff and the Class to the detriment of Plaintiff and the Class.

151. It would be inequitable and unjust for VIZIO to retain these wrongfully obtained profits and benefits at Plaintiff's and the Florida Class's expense.

152. VIZIO's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

153. Plaintiff and the Florida Class are entitled to restitution of the profits unjustly obtained, plus interest.

**FIFTH CLAIM FOR RELIEF**
**PRIVACY VIOLATION BASED ON INTRUSION**

**(On Behalf of Plaintiff and the Nationwide Class Against All Defendants, under the laws of Florida)**

154. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

155. VIZIO, by collecting and disseminating Plaintiff's viewing habits without his knowledge, intentionally intruded into a realm in which Plaintiff has a reasonable expectation of privacy.

156. VIZIO obtained unwanted access to Plaintiff's data, including but not limited to, the media content Plaintiff is viewing, when Plaintiff is viewing it, and whether he is viewing it live or at a later time.

157. VIZIO's intrusion into Plaintiff's privacy would be highly offensive to a reasonable person, namely because it occurred without Plaintiff's consent or knowledge.

158. By invading Plaintiff's privacy, VIZIO has obtained moneys which rightfully belong to Plaintiff and the Class.

159. It would be inequitable and unjust for VIZIO to retain these wrongfully obtained profits and benefits at Plaintiff's and the Class's expense.

160. Plaintiff and the Class are entitled to restitution of the profits unjustly obtained (plus interest), as well as damages for VIZIO's invasion of privacy.

## SIXTH CLAIM FOR RELIEF

### Intentional Misrepresentation/Fraud by Omission
### (On Behalf of Plaintiff And The Florida Class Against All Defendants)

161. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

162. Defendants concealed, suppressed, or omitted material facts concerning VIZIO Smart TVs, to wit, the existence of the Smart Interactivity software that tracks and collects the users' information and viewing history as well as information from other devices that are connected to the user's Wi-Fi network and its disclosure of such viewing history, along with personally identifiable information.

163. Defendants were under a duty to Plaintiff and Class members to disclose that the Smart TVs contained the pre-enabled tracking software and that VIZIO disclosed the information collected by that software and other software due to the following:

a. Defendant VIZIO, as the manufacturer, was in a superior position to know of the existence of the pre-enabled tracking software on VIZIO Smart TVs and its dissemination of such data;

b. The Video Protection Privacy Act prohibits the collection, interception, disclosure, and/or transmission of the information at issue without the prior, informed consent of Plaintiff and the Class members or the opportunity, given in a clear and conspicuous manner, to prohibit the disclosure;

c. Plaintiff and Class members could not reasonably have been expected to learn or discover that VIZIO included pre-enabled tracking software on its TVs and its dissemination of such information;

d. VIZIO should have known that Plaintiff and Class members could not reasonably have been expected to learn or discover that VIZIO included pre-enabled tracking software on its TVs, and in fact, VIZIO took steps to actively conceal the tracking software; and

e. VIZIO should have known that the existence and nature of the pre-enabled software and the dissemination of such data was a material fact that influenced the purchasing decision of Plaintiff and Class members.

164. Defendants intentionally concealed, suppressed, or omitted the material facts described above with the intent to defraud Plaintiff and Class members because Defendants knew or should have known that Plaintiff and Class members would not have purchased the Smart TVs, or would have paid less, if the existence of the software were disclosed.

165. A significant part of Defendants' marketing of VIZIO Smart TVs was informing consumers that the TVs could be connected to the internet through a home network, or to cable and satellite television, or to gaming consoles. Defendants deliberately chose, however, to omit the fact that connecting to the internet or these devices would allow Defendants to track, record, and disseminate for profit the personal viewing histories and personally identifiable information without the consumers' affirmative consent.

166. Defendants recognize the materiality of the tracking software in Defendants' Prospectus, as set forth above, by admitting that if the public knew the truth, it could significantly impact sales of its Smart TVs and its ability to profit from the sale of users' personally identifiable information to third parties.

167. Plaintiff and Class members were unaware of the existence of the tracking software on VIZIO's Smart TVs at the time of the purchases. Had they known, Plaintiff and Class members would not have purchased VIZIO Smart TVs, or would have paid less for them.

168. Defendants' conduct directly and proximately caused Plaintiff and Class members actual monetary damages as a result of the unauthorized use, and dissemination of, their personal information.

169. Plaintiff and Class members seek damages, including punitive damages, reasonable attorneys' fees, and costs as a result of Defendants' fraudulent omissions.

## SEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation/Omission
### (On Behalf of Plaintiff and the Florida Class Against All Defendants)

170. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

171. Defendants negligently concealed, suppressed, or omitted a material fact. To wit, Defendants concealed the existence of the Smart Interactivity tracking software that tracks and collects the users' information and viewing history as well as information from other devices that are connected to the user's Wi-Fi network and its disclosure of such viewing history, along with personally identifiable information.

172. Defendants were under a duty to Plaintiff and Class members to disclose that the Smart TVs contained the pre-enabled tracking software and that it disseminated such data due to the following reasons:

a. VIZIO, as the manufacturer, was in a superior position to know of the existence of the pre-enabled tracking software and the dissemination of data on VIZIO Smart TVs;

b. The Video Protection Privacy Act prohibits the collection, interception, disclosure, and/or transmission of the information at issue without the prior, informed consent of Plaintiff and the Class members or the opportunity, given in a clear and conspicuous manner, to prohibit the disclosure;

c. Plaintiff and Class members could not reasonably have been expected to learn or discover that Defendants included pre-enabled tracking software on the Smart TVs, including the dissemination of such data;

d. Defendants should have known that Plaintiff and Class members could not reasonably have been expected to learn or discover that Defendants included

pre-enabled tracking software on its TVs, and in fact, Defendants took steps to actively conceal the tracking software; and

e. Defendants should have known that the existence and nature of the pre-enabled software was a material fact that influenced the purchasing decision of Plaintiff and Class members.

173. Defendants negligently concealed and/or suppressed information about the tracking software and the dissemination of data collected by that software and other software. Defendants should have known that Plaintiff and Class members would not have purchased the Smart TVs for the price they paid if Defendants had disclosed the existence of pre-enabled tracking software.

174. Defendants recognized the materiality of the tracking software and the dissemination of data in VIZIO's Prospectus, as set forth above, by admitting that if the public knew the truth, it would significantly impact sales of its Smart TVs and its ability to profit from the sale of users' personally identifiable information to third parties.

175. Plaintiff and Class members were unaware of the existence of the tracking software on VIZIO's Smart TVs at the time of the purchases, along with the dissemination of data by that software and other software. Had they known, Plaintiff and Class members would not have purchased VIZIO Smart TVs or would have paid less for them.

176. Defendants' conduct directly and proximately caused Plaintiff and Class members actual monetary damages in the form of the purchase price of the Smart TVs and damages as a result of the unauthorized access.

177. On behalf of himself and the Class, Plaintiff seeks damages, including expenses, attorneys' fees, and costs, as a result of Defendants' negligence.

## VII. PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a. Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff is a proper class representative, and appoint Plaintiff's Counsel as counsel for the Class;

b. Enter an order declaring Defendants' actions are unlawful;

c. Award Plaintiff and class members appropriate relief, including actual, statutory, and punitive damages;

d. Award Plaintiff and class members restitution, disgorgement, and other equitable relief as the Court deems proper;

e. Award injunctive and declaratory relief as may be appropriate;

f. Award attorneys' fees and all other costs of prosecuting this action;

g. Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

h. Grant additional legal or equitable relief as this Court may find just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated: March 15, 2017

**GIRARD GIBBS LLP**

*/s/ Eric H. Gibbs*

Eric H. Gibbs
ehg@classlawgroup.com
Andre Mura
amm@classlawgroup.com
Linda Lam
lpl@classlawgroup.com
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701

*Attorneys for Plaintiff*